3

2402-11-002582

# CITATION

SUE BELL
(Plaintiff)

Vs.

HERCULES LIFTBOAT COMPANY, LLC
(Defendant)

NUMBER C601152 SECTION 22

19th JUDICIAL DISTRICT COURT

PARISH OF EAST BATON ROUGE

STATE OF LOUISIANA

TO: *HERCULES LIFTBOAT COMPANY, LLC*
THROUGH REGISTERED AGENT FOR SERVICE
CAPITOL CORPORATE SERVICES
8550 UNITED PLAZA BLVD STE 305
BATON ROUGE, LA 70809

GREETINGS:

Attached to this citation is a certified copy of the petition*. The petition tells you what you are being sued for.
You must EITHER do what the petition asks OR, within fifteen (15) days after you have received these documents, you must file an answer or other legal pleading in the office of the Clerk of Court at 300 North Boulevard, Baton Rouge, Louisiana. If you do not do what the petition asks, or if you do not file an answer or legal pleading within fifteen (15) days, a judgment may be rendered against you without further notice.
This citation was issued by the Clerk of Court for East Baton Rouge Parish on 28-APR-2011.

_Jessica Hughes_/Deputy Clerk of Court For
Doug Welborn, Clerk of Court

Requesting Attorney: CHARLOTTE C MCGEHEE

*The following documents are attached:
PETITION FOR DAMAGES

---

### SERVICE INFORMATION:

Received on the ____ day of _____, 20___ and on the ____ day of _____, 20___, served on the above named party as follows:
PERSONAL SERVICE: On the party herein named at _____.

DOMICILIARY SERVICE: On the within named _____, by leaving the same at his domicile in this parish in the hands of _____, a person of suitable age and discretion residing in the said domicile at _____.

SECRETARY OF STATE: By tendering same to the within named, by handing same to _____.

DUE AND DILIGENT: After diligent search and inquiry, was unable to find the within named _____ or his domicile, or anyone legally authorized to represent him.

RETURNED: Parish of East Baton Rouge, this ____ RECEIVED ____ , 20___.

MAY 03 2011

SERVICE:  $_____
MILEAGE:  $_____
TOTAL:    $_____


Parish of East Baton Rouge

CITATION - 2402

EBR767242

| | |
|---|---|
| SUE BELL | NUMBER: 601152  DIVISION **SEC. 22** |
| VERSUS | 19th JUDICIAL DISTRICT COURT |
| HERCULES LIFTBOAT COMPANY, L.L.C | PARISH OF EAST BATON ROUGE |
| | STATE OF LOUISIANA |

## PETITION FOR DAMAGES

Now comes, through undersigned, petitioner, comes petitioner, Sue Bell, a major and domicile of Lafayette Parish who does represents the following statement of facts:

1.

### Jurisdiction and Venue

La. R.S. 23:303 provides "A plaintiff who has a cause of action against an employer . . . may file a civil suit in a district court. . ." .

2.

Venue is proper pursuant to La. C.C.P. 42 in that a foreign limited liability company licensed to do business in this state shall be brought in the parish where its primary business office is located as designated in its application to do business in the state, which is listed with the Louisiana Secretary of State for this Defendant as: Registered Office in Louisiana, 8550 United Plaza Building II Ste 305, Baton Rouge, LA 70809.

3.

### Parties

**PLAINTIFF:**

Sue Bell is a major domiciled in the Parish of Lafayette, State of Louisiana.

4.

**DEFENDANT:**

Hercules Liftboat Company, L.L.C. (Hereinafter Hercules) is a non-Louisiana Company licensed to do and doing business in Louisiana whose registered office in Louisiana is 8550 United plaza Building II, Ste 305, Baton Rouge, LA 70809

5.

Plaintiff, a former employee of Defendant, Hercules, was wrongfully terminated on the basis of her disability and/or being regarded as disabled as those terms are defined by law .

6.

EBR747822

Defendant, Hercules, was aware of the disability of Ms. Bell and refused to reasonably accommodate her disability although the company had the means to accommodate Ms. Bell.

7.

The specific facts of the employment of Plaintiff, Sue Bell are set out in pertinent part as follows from Plaintiff's perspective:

8.

Ms. Bell was hired in March 2007 as an estimator, cost controller.

9.

She was provided the opportunity to reorganize and establish protocols with little to no management directions. No reorganization directions were provided Ms. Bell during this reorganization process.

10.

Ms. Bell implimented the improvements and project management successes which were reported to both then president Randy Reed and VP of finance Renee Pitre on a regular basis.

11.

Several months after her hire, Ms. Bell was awarded a $15,000 yearly raise. In February 2009 then president Randy Reed visited her and provided her with a letter from Corporate of an additional promised cash retention incentive bonus $14,700 to be payable March 1, 2010 if she remained with Hercules as an employee. Mr. Reed also discussed during that meeting a separate HERO bonus of $9,257.43 earned for her 2009 performance, and provided Ms. Bell with confirmation of 1,500 shares of stock options he explained then to be worth $30,000. Hercules stock then was at $21.00 per share.

12.

The 1,500 award of shares opted 1/3 to vest on February 25, 2010, 1/3 to vest February 25, 2011, 1/3 to vest on February 25, 2012.

13.

In February 2010 Hercules again awarded Ms. Bell another 2,639 shares of restricted stock pursuant to Hercules long term incentive plan due to the positive results surrounding her position. The 2,639 restricted stock was to vest 1/3 on February 24, 2011, 1/3 on February 24, 2012, and 1/3 on February 24, 2013.

14.

Case 3:11-cv-00332-JJB-SCR   Document 1-3   05/18/11   Page 4 of 14

All of these awards and recognition were awarded due to a direct result of Ms. Bell's outstanding positive performance.

15.

Dry dock flourished and protocols Ms. Bell set in place benefited Hercules with cost savings and revenue opportunity of substantial amounts.

16.

The dry dock division had no project management protocols or management principles in place until Ms. Bell's arrival, Ms. Bell implemented an entire dry dock electronic file and hard file copy system is in place on each vessel beginning since 2006 current to date of her departure.

17.

Ms. Bell designed formidable project management spreadsheets and budget tracker spreadsheets to assist in the reorganization efforts. These spreadsheet tools enabled "real time" cost and project management analysis.

18.

Prior to her arrival USCG event days were at 60+ days on topsides and 90+ days on hulls. Ms. Bell assisted in reducing the average USCG turnaround average is 39 days.

19.

Ms. Bell voiced her concerns on multiple occasions to Renee Pitre that she was concerned about discrimination and that Byron Allemand was seeking to terminate Ms. Bell because of her disability. Renee Pitre on each occasion said that would never happen, and she assured Ms. Bell she was not going anywhere given her value as interpreted by her.

20.

Ms. Bell's cancer was diagnosed in November 2009.

21.

Ms. Bell subsequently had a surgery related to the cancer which took place in February 2010 with weeks of difficult radiation and treatment following.

22.

Ms. Bell had a really difficult medical time and discussed partial disability with Hercules Corporate HR. They advised it was easier for them to track Ms. Bell's time off as full disability, and thus six months full disability was approved. During that time, IT came to Ms. Bells' home and set up a computer with citrix, a wireless router and Hercules laptop as well as citrix on her

personal computer in order that she could continue to conduct business as she could during her time of treatment.

23.

Ms. Bell returned to work, still under medical duress, in later July 2010.

24.

In March, 2010, Ms. Bell's oncologist began prescribing the post-cancer medications that Ms. Bell "must" take for percentage of survival, and the medicine had devastating side effects.

25.

The first medication, Aromasin, had substantial effects on Ms. Bell, including her coping skills.

26.

Because of the side effects, Ms. Bell had substantial difficulty caring for herself, and her doctors tried a second medicine, Arimidex, which the side effects were also too severe.

27.

Because of the severe, life- altering side effects, the medication was changed again to Femara which also caused severe side effects.

28.

Ms. Bell had one other medication left to try that she must take and in fact she is presently taking the last medication, tamoxifene. It also has severe side effects affecting Ms. Bell's daily life activities.

29.

The side effects experienced, include, hot flashes, hair loss, joint/bone/muscle severe chronic pain. Unusual sweating, nausea, diarrhea, major difficulty sleeping (even with trying several sleep medications) mental mood changes, depression, anxiety, severe shortness of breath, significant confusion and inability to focus, muscle weakness, significant vision changes at all ranges, and random tingling and numbness.

30.

Ms. Bell lost 23 lbs in two and half weeks as a result of one of the medications. These drugs nearly destroyed any ability of coping or concentration skills. The shortness of breath was so severe, Ms. Bell had been concerned that she was experiencing a heart attack and /or stroke. These medications can stop all production of any estrogen in the body which makes the severity

of the side effects increase.

31.

Ms. Bell was informed that the cancer Ms. Bell was diagnosed with was estrogen driven and doctors told her she is at risk of secondary cancers and that secondary cancers are normally much worse cancers to deal with.

32.

Another side effect in taking these drugs is increased levels of cholesterol and triglycerides, a serious health issue. This information about her condition and the effects was communicated to the supervisor at Hercules, and HR at Hercules was aware of this during Ms. Bell's employment.

33.

During the entire process of trying these medications Hercules, including Byron Allemand, Ms. Bell's supervisor, were aware of her medical condition, health issues and difficulties with cancer treatment. Ms. Bell discussed her concerns with co-workers about her ongoing disability and her concerns for potential termination given the cost of her medical condition to Hercules a self insured entity.

34.

Ms. Bell had multiple conversations with Renee Pitre who commented she had an acquaintance who related the same severe symptoms as to how bad these drugs are with regards to side effects.

35.

One such conversation included Rose an assistant to Mrs. Pitre who knew someone experiencing the same serious difficulties. HR Mary Coffelt was also aware of Ms. Bell's difficulties with cancer after treatments and mailed Ms. Bell a personal note with well wishes for a better year ahead.

36.

Certain of Ms. Bell's fellow co-workers and other Hercules workers on the third floor checked on Ms. Bell daily, since she returned to work in August 2010, and these employees including Byron Allemand were aware of the ongoing difficulty with cancer treatment.

37.

While on the Aromasin, Ms. Bell began developing bladder infections. Due to blood

found in testing, the urgent care doctor urged that she should see a specialist, Dr. Autin who ordered a CT abdomen Pelvis with and without contrast test to be done on October 7, 2010 because of his concerns.

38.

Ms. Bell was still very ill and could not make the test when it was suggested. Ms. Bell had earlier authorized Corporate HR to access all of her medical information so that they could try and correct Cigna's errors of non-payment of bills. Thus, Hercules had access to all information of testing being run and the results for Ms. Bell.

39.

Just prior to Ms. Bell's termination, Dr. Blanchet, a cancer oncologist was scheduling a January 10 appointment, then rescheduled for January 21, 2011 appointment for a CT of the neck with contrast for a mass Ms. Bell now has on the back of her neck. Corporate HR would have had all of this private medical information.

40.

Ms. Bell's condition, health issues and the serious side effects that were disabling to her professionally were the reason that she was terminated from Hercules employment.

41.

Because of her health issues, Ms. Bell was attempting to have her subordinate, employee, Dana Clark perform the function of her job duties which heretofor, Ms. Bell had performed in the past.

42.

Just months prior to Ms. Bell's termination corporate management had Ms. Bell scheduled to attend HERO II management training which she did attend in Houston, Texas. Ms. Bell applied the training of HERO II training of progressive disciplinary policy as outlined in that management training in relationship to the problems Ms. Bell was experiencing with Dana Clark since she returned from her disability time off. At the on start HR Mary Coffelt warned Dana in Ms. Bell's presence during a meeting that Dana's slanderous comments about Ms. Bell and her work product were grounds for immediate termination. During that meeting Mary Coffelt advised her that she placed significant authority with Hercules managers as Ms. Bell. Coffelt mandated a second meeting within the next weeks which two additional meetings took place with progressive documentation being provided by Mary Coffelt.

43.

Ms. Coffelt mentioned she may need to bring this to the attention of Mr. Allemand with regards to firing Clark if it became necessary. Ms. Bell requested that Mary Coffelt hold onto the progressive documents that it was Ms. Bell's intention to save the Hercules asset it held in Dana Clark., but found out shortly before Ms. Bell's termination that, Ms. Coffelt had provided all progressive disciplinary documents on Dana Clark to Byron Allemand after each meeting.

44.

During the later meeting Ms. Bell had with Ms. Coffelt Ms. Bell suggested that Ms. Coffelt meet with other co-workers who had complaints about Ms. Clark. In the interim Mary Coffelt's posture changed when she later met with Rachael Gautreaux, Christine Castille and Mary Morvant regarding Dana Clark after Ms. Bell began her progressive discipline of Ms. Clark for not performing her job.

45.

Rachael Gautreaux, Christine Castille and Mary Morvant informed Ms. Bell that by the time of their meeting with Ms. Coffelt, her postured was adverse to Ms. Bell. Ms. Bell opinioned Ms. Coffelt's posture change could only be due to Mr. Allemand's inference with Ms. Bell's supervisory capacity over Ms. Clark rather than assisting her as a manager in the disciplinary process in effort to correct significant issues of insubordination and performance errors.

46.

On January 26, 2011, Ms. Bell was terminated. On, the day of her termination, Coffelt and Ms. Bell remained in the conference room so that they could go over a severance package which included a release of any and all claims against the company, wherein it was explained that there would be no bonus or severance unless all claims were released against the company and other employees, although the bonus had already accrued to Ms. Bell's favor.

47.

On that same day Allemand called co-employees Dana and Rachael into his office. Allemand told them that the position held by Ms. Bell had been eliminated and they could leave the office so as not to come in conflict of circumstances of Ms. Bell departure.

48.

Oddly Allemand appeared nervous during Ms. Bell's termination, stating only "your position has been terminated" and got up and left the conference room. No hand shake, no,

thanks for your service, sorry about the circumstances, nothing. He also appeared agitated and angry.

49.

Allemand sent out an email the next day addressed to "PUBLIC LIFTBOAT" that read "Sue Bell is no longer with our team. Sue has been a hard worker for our company, and we wish her well. Any requests that would have normally have gone to Sue should be directed to Tim Reed".

50.

During the severance package review Ms. Bell asked Coffelt if her termination had anything to do with her progressive discipline of Dana Clark to correct ongoing issues and reinstate Ms. Clark's job responsibilities at a time Ms. Bell required accommodation, or due to other cancer issues. Ms. Coffelt never directly denied the termination was because of cancer disabling treatment, she simply stated that Mr. Allemand had been "reviewing" all employees for a year.

51.

Ms. Coffelt told Ms. Bell that others were also being terminated, but all other employees in the Hercules office who were laid off were in the drilling divisions, and no one else in the Lift boat division was terminated except Sue Bell.

52.

Coffelt's multiple comments that other liftboat employees were being terminated at the same time was misleading Ms. Bell in an attempt to obtain her signature on a release.

53.

Ms. Coffelt then stayed and assisted Ms. Bell while she packed her personal belongings.

54.

Hercules is self insured. At the time of the disability Ms. Bell was entitled to the benefit of health insurance, medication, life, vision, dental and disability insurance.

55.

Ms. Bell drew short term disability due to radiation treatment for cancer from 2/7/10 to 7/18/10.

56.

Ms. Bell is required to be on five year post-cancer medication causing long term

disability symptoms that began on the first prescribed medication date in March 2010.

57.

Ms. Bell has suffered loss of livelihood, a six figure yearly income, loss of medical life, medication, dental, life insurance and short-long term disability benefits. Ms. Bell lost her vision policy and the loss of Hercules stock which did not vest until 2012, as well as emotional distress. Ms. Bell is presently incurring great difficulty in managing her ongoing precarious health issues.

58.

Ms. Bell lost her opportunity to receive a bonus every year and the last bonus paid was not paid until written demand and after termination on April 20, 2011, well after termination.

59.

Ms. Bell had planned retirement at the age of 68 which is irreversibly affected adversely given the loss of income and benefits since her termination date forward to her planned retirement age of 68. This loss of Hercules income will negatively affect the determination of her social security retirement benefit, and future financial ability to care for herself and her continuing medical care needs. Current life essential needs that have added additional financial burdens due to her precarious health issues.

60.

### FIRST CLAIM FOR RELIEF

Plaintiff seeks relief pursuant to La. R.S. 23:301 *et seq.* for discrimination.

61.

### SECOND CLAIM FOR RELIEF

Plaintiff seeks relief under La. R.S. 23:323 *et seq.* for discrimination.

62.

### THIRD CLAIM FOR RELIEF

Plaintiffs seek relief in form of attorneys fees and cost pursuant to La. R.S. 23:303.

63.

### FOURTH CLAIM FOR RELIEF

In the alternative, Plaintiff seeks relief for harassment and intentional infliction of emotional distress for all damages arising there from pursuant to La. C.C. art. 2315. This claim is supplemental and incidental to and forms part of an ongoing, and arises out of the same,

transaction or occurrence or common course of events as set forth in the original complaint for which remedy(ies) lies under state law.

64.

### FIFTH CLAIM FOR RELIEF

After reporting her disability, Ms. Bell was retaliated against, in violation of law.

65.

This Court has jurisdiction over this claim pursuant to La. R.S. 23:303 et seq.

66.

Defendants are indebted to Ms. Bell pursuant to La. C. C. 2320.

67.

### SIXTH CLAIM FOR RELIEF

Defendants are indebted to Ms. Bell pursuant to La. 23:631 et seq for payment of her daily wage during the time bonus pay was not paid after termination and any other sums due at the time of her wrongful termination which were never paid.

68.

### JURY TRIAL REQUESTED

Plaintiff prays for jury trial on all issues and asserts, damages would be in excess of the requisite amount for a jury trial.

WHEREFORE, Plaintiffs prays that Defendants be cited to appear and answer and that after resolution of this matter that this Court enter Judgment in favor of Plaintiffs against Defendants with legal interest from the date of demand as follows:

1. Lost back and front pay, all other lost employment benefits and stock vesting and award options;

2. For emotional and mental distress, pain and suffering, humiliation, embarrassment and loss of employment opportunity;

3. Medical and pharmaceutical bills and services past, present and future;

4. All litigation expenses;

5. For attorneys fees and for costs as may be allowable by law;

6. For such other relief that the Court may deem just, equitable or proper.

RESPECTFULLY SUBMITTED BY:

Charlotte C. McDaniel McGehee # 26411
Charlotte C. McDaniel McGehee APLC
6513 Perkins Road
Baton Rouge, LA 70808
Telephone: (225)389-6711
Fax: (225)372-2607

**PLEASE SERVE:**
THROUGH REGISTERED AGENT FOR SERVICE
CAPITOL CORPORATE SERVICES, INC.
8550 UNITED PLAZA BUILDING II, STE. 305
BATON ROUGE, LA 70809

CIVIL

- ☒ 01-DAMAGES
- ☐ 02-CONTRACT
- ☐ 03-PRISONER SUIT
- ☐ 04-EXECUTORY PROCESS
- ☐ 05-SUIT ON NOTES
- ☐ 06-EVICTION
- ☐ 07-WORKERS COMPENSATION
- ☐ 08-JUDICIAL REVIEW
- ☐ 09-PROPERTY RIGHTS
- ☐ 10-INJUNCTION MANDAMUS
- ☐ 11-COMM. PROP. PARTITIONS
- ☐ 12-PUBLIC SERV. COMM.
- ☐ 13-OTHER PARTITIONS
- ☐ 14-OTHER
- ☐ 15-D.E.Q.
- ☐ 16-
- ☐ 17-
- ☐ 18-
- ☐ 19-
- ☐ 20-

# Charlotte C. McDaniel McGehee

*A Professional Law Corporation*
6513 Perkins Road   Baton Rouge, Louisiana 70808
Telephone: (225) 389-6711  Fax: (225) 372-2607

E-mail: charlotte@mcdanielmcgehee.com

April 22, 2011
Via U.S. Mail

Honorable Doug Welborn
Clerk, 19th Judicial District Court
Post Office Box 1991
Baton Rouge, Louisiana 70821-1991

RE:   Sue Bell v. Hercules Liftboat L.L.C.
      **NEW SUIT**

Dear Sir:

Please find enclosed an original and two (2) copies of the *Petition for Damages* for the above captioned matter. Please file the original into the record and return to me a stamped copy of same in the self-addressed stamped envelope enclosed.

Please use the remaining enclosed copy for service. My firm operating check no. 1396 in the amount of $470.00 is enclosed to cover the cost of filing and service.

Thank you in advance for your assistance in this matter.

Sincerely,

Charlotte C. McDaniel McGehee

CCM/cm

| | | |
|---|---|---|
| SUE BELL | * | NO. 601,152 SEC. 22 |
| VERSUS | * | 19TH JUDICIAL DISTRICT COURT |
| HERCULES LIFTBOAT COMPANY, L.L.C. | * | PARISH OF EAST BATON ROUGE |
| | * | STATE OF LOUISIANA |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### NOTICE OF FILING OF NOTICE OF REMOVAL

TO:   Mr. Doug Welborn, Clerk of Court
19th Judicial District Court
Parish of East Baton Rouge
300 North Boulevard
P.O. Box 1991
Baton Rouge, LA 70821-1991

Attached is a copy of the Notice of Removal that was filed today in the United States District Court for the Middle District of Louisiana, removing these proceedings from this Court.

Respectfully submitted, this 18 day of May, 2011.

Respectfully submitted,

STEPHEN P. BEISER, T.A. (#14074)
McGLINCHEY STAFFORD PLLC
601 Poydras Street – 12th Floor
New Orleans, Louisiana 70130
Telephone: (504) 586-1200
Facsimile: (504) 324-0965
AND
KYLE A. FERACHI (#27458)
McGLINCHEY STAFFORD PLLC
One American Place, Fourteenth Floor
Baton Rouge, Louisiana 70825
Telephone: (225) 383-9000
Facsimile: (225) 343-3076

ATTORNEYS FOR DEFENDANT
HERCULES LIFTBOAT COMPANY, L.L.C.

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon counsel listed below via U.S. Mail on this 18 day of May, 2011.

Charlotte C. McDaniel McGehee
Charlotte C. McDaniel McGehee APLC
6513 Perkins Road
Baton Rouge, Louisiana 70808
ATTORNEY FOR PLAINTIFF

KYLE A. FERACHI

379612.1